## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

      Plaintiff,

v.

DISH NETWORK, LLC.,

      Respondent.

---

### MEMORANDUM IN SUPPORT OF APPLICATION FOR AN ORDER TO SHOW CAUSE WHY ADMINISTRATIVE SUBPOENAS SHOULD NOT BE ENFORCED

---

This case is before the Court on the application of the Equal Employment Opportunity Commission ("EEOC") for an Order to Show Cause Why Administrative Subpoenas Should Not Be Enforced. The EEOC is currently investigating a charge of disability discrimination filed against DISH Network, LLC., ("DISH" or "Respondent"), under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101-17 ("ADA"). But this charge is not the prototypical charge of yesteryear. Instead, this charge, unlike the charges of the past, names on its face a computer program, (in this case an electronic application), widely used by DISH, as the alleged root of the problem – it does not point the finger at individual, localized, or discretionary management practices as was more historically common. But, in this increasingly digital era, employers' hiring practices have unquestionably changed. Millions of workforce applicants are impacted by online applications every year as these become the dominant, indeed often times the

only, mode for obtaining work. Thus, as employers' hiring practices have evolved, so too has the EEOC needed to adapt and tailor its investigations in order to respond to today's emergent business practices. In a society where computers matter so much, electronic applications are no less immune from the agency's right to investigate potential discrimination in an employer's hiring processes than the hiring practices of previous decades.

In the course of its investigation, the EEOC issued two administrative subpoenas seeking information and documents relating to DISH's online application process. In these, the EEOC sought information and records relevant to two major issues: (1) to determine whether DISH's online application process operates to systematically discriminate against individuals with disabilities by precluding them from applying for and being considered for positions that they are qualified for and able to perform, with or without reasonable accommodation; and (2) to identify individuals who were screened out by the electronic process so that the EEOC could perform further interviews and find out if additional potential adversely affected applicants exist, and whether the program has created a deleterious disparate impact on disabled applicants. To date, Respondent has refused to produce much of the information sought by the EEOC, and that refusal has greatly delayed and impeded the EEOC's investigation of the charge. The EEOC therefore applies to this Court to issue an Order to Show Cause Why Administrative Subpoenas Should Not Be Enforced.

## I. FACTUAL BACKGROUND

The Charging Party, George Stewart, filed a charge of discrimination alleging that Respondent DISH discriminated against him on the basis of disability and age. [Ex. 1, Stewart Charge]. Stewart alleged that he was denied equal employment opportunities when he tried to

apply for a Customer Service Representative position ("CSR"), which required him to apply online, but he was precluded from completing the online application. At an early stage in the application process, Stewart was required to answer a set of questions on one screen including one about his shift availability. Specifically, the online application stated, "DISH is a 7 day a week customer service center. Most employees will be required to work evenings, weekends, and holidays. Are you available to work these types of shifts?" DISH then allowed only two options for answer – "yes" or "no" – with no space provided for explanation or to request an accommodation. Stewart, who has epilepsy, can work eight hour shifts, but is unable to work late at night at the risk of increasing his probability for seizures. Upon answering the question "no," the software program utilized by Respondent automatically terminated the application process and would not allow Stewart to proceed and complete the application for employment. DISH has no alternative procedures for applying for a CSR position and states that it will not hire anyone who does not complete the online application. When the application aborted on Stewart, the screen provided no instructions about whom to contact or any alternative options for proceeding with the application process, and said nothing about what to do if Stewart wished to explain his answer or if he thought that he might need to request an accommodation. A copy of Stewart's electronic application and the preliminary questions, provided by Respondent, is attached as Exhibit 2.

The EEOC began an investigation. The issue of whether an employer is obligated to accommodate an applicant or employee with a schedule accommodation is a fact-specific inquiry; however "the ADA considers a modified work schedule to be a reasonable accommodation," in many circumstances. *Holt v. Olmsted Twp. Bd. of Trustees*, 43 F. Supp. 2d

812, 823-24 (N.D. Ill. 1998) (denying employer's motion for summary judgment with respect to plaintiff's ADA accommodation claim when plaintiff requested permanent day shift schedule and defendant failed to provide sufficient evidence of undue burden).[1] An employer is required to engage in the interactive process with applicants and employees and explore potential accommodations that would allow that individual to work if they are otherwise qualified. *Gile v. United Airlines, Inc.*, 213 F.3d 365 (7th Cir. 2000). The interactive process "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Id.* (internal quotations omitted).[2] Thus, when the EEOC received Stewart's charge, it began an investigation into, *inter alia*, whether DISH failed to provide a reasonable accommodation to Stewart and other applicants, and systematically failed to engage in the interactive process with them, due to aspects of its mandatory online application and over-all hiring practices.

On December 14, 2010, the EEOC served DISH with a copy of Stewart's charge and submitted an initial Request for Information ("RFI"). [Ex. 3, Declaration of Rayford O. Irvin, District Director ¶. 4b ("Dir. Decl.")]. The EEOC received DISH's position statement responding to the allegations in Stewart's charge and itemized answers to the EEOC's first RFI on January

---

[1] *See also Livingston v. Fred Meyer Stores, Inc.*, 388 Fed. Appx. 738, 740-741 (9th Cir. 2010) (summary judgment reversed because day shift schedule for seeing impaired employees was reasonable accommodation and employer failed to supply sufficient evidence of undue hardship); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 505-508 (3rd Cir. 2010)(same fact pattern and holding).

[2] In analyzing the interactive process and whether an employer engaged in a good-faith discussions, the EEOC, like the courts, "[i]n essence,...attempt[s] to isolate the cause of the breakdown and then assign responsibility." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3rd Cir. 199); *see also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999); *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004).

18, 2011. [Ex. 4, DISH PS & RFI Responses]. A chart of the application process steps attached to the statement indicates that the first step in DISH's application process if directing the candidate flow to the FurtPerson landing site from which the applicant accesses the online application. [*Id.* at p. 29]. In its position statement, DISH explained that when Stewart attempted to apply for the CSR position on November 10, 2010 he began the "online assessment" with DISH's third party administrator, FurstPerson. [*Id.* at p. 2]. But, according to DISH, Stewart was not provided the opportunity to finish and submit the application because the software automatically precluded candidates from continuing on and completing the application if he or she provides an unsatisfactory answer to any of the pre-screening questions. [*See id.* at 2, 3, 9]. DISH confirmed that when Stewart marked "no" to the shift-availability question, "he was not able to continue the assessment." [*Id.*] Moreover, Respondent stated that had Stewart selected "yes" he "would have been allowed to proceed with the rest of the assessment to determine if he had the ability to do the job. If it was determined he had the ability to do the job he would have been asked to schedule an office appointment. At the time of the office appointment Mr. Stewart would have had the ability to engage in the accommodation discussion with someone in Human Resources." [*Id.* at p. 3]. Thus it appears that at *no point in time during the entire online application process* is an applicant able to request an accommodation, able to disclose their disability, provided the opportunity to explain how he or she is able to perform the essential functions of the job with or without a reasonable accommodation, or given specific instructions on how to engage in the interactive process – not only with respect to the shift-availability question.

On June 29, 2011 the Commission sent DISH a second RFI, asking it to describe the online application process and the software used to administer the online assessment. [Ex. 3, Dir. Decl. at ¶. 4c; Ex. 5, EEOC's 2nd RFI]. In this second RFI, the EEOC also requested, *inter alia*, that Respondent provide information about the online application process and how it was developed; the scope of use of the online application; the identity of, and information about, the numbers of applicants who began, were unable to complete, and who completed the online application; identification of any applicants who did not complete the online application but still obtained employment as a CSR; procedures for discussing and obtaining accommodation in the application process; and information about how Respondent gathers, uses, and stores electronic information relating to the online application process. [*See* Ex. 5].

On August 17, 2001, DISH supplied its answers to the EEOC's second RFI and informed the agency that since March 9, 2009, and ongoing, it has required all applicants on a nation-wide basis for the CSR position and for similar jobs in "this job family" to complete the online assessment if they wished to be considered for employment. [Ex. 6, DISH Responses to 2nd RFI, pp. 2-3]. As part of Respondent's application, there is a series of preliminary questions which Respondent did not distinguish from the online application or assessment at the onset of the investigation, but more recently seeks to do so, referring to these questions as "pre-screening" questions. These preliminary questions, and the remainder of the on-line application process, which collectively Respondent refers to as the "assessment," are all administered through a platform developed by FurstPerson. [*Id.* at p. 2, 3; *see also* Ex. 4 at p. 2].[3] It further stated that

---

[3] According to Respondent, "FurstPerson provides a web-based software solution that enables hiring organizations to administer pre-screening questions, surveys, tests, and assessments to job candidates for the purposes of aiding the hiring-process." [Ex. 5, at p. 2].

DISH has neither considered nor hired any candidates for a CSR position who did not complete the FurstPerson online application. [Ex. 6 at p. 3]. However, Respondent refused to provide specifics about what information was collected or how and where information and records were maintained and preserved, and refused to provide details or screen shots of the remainder of the online assessment. [*Id.* at pp. 2-3, 7-8].

On December 20, 2011, EEOC issued a third RFI. [Ex. 7, EEOC's 3rd RFI]. The EEOC repeated many of the questions it had asked in June, explaining that the information sought was necessary in order for the agency to determine whether Stewart and others potential applicants with disabilities were discriminated against by the online application process, and reminding DISH that, Respondent disclosed that "all" CSR candidates were required to complete the same online assessment and that the FurstPerson platform was administered nationwide for the same job family, thus EEOC's requests were relevant and not overbroad. "Charging Party was required to undergo the exact same electronic application process as DISH applicants in other facilities and locations." [*Id.* at pp. 3-4]. The EEOC also made clear a number of times that it was of no bearing that the Respondent's application process aborted on Stewart at an early stage of the application process because the Commission sought information about the application process and whether it discriminated against Charging Party and other potentially disabled applicants, and that the EEOC was unable to proceed with its investigation without information regarding the application and hiring process, particularly the online application implicated in Stewart's charge, and that the EEOC needed to understand the Respondent's application and hiring process if it is to be able to ascertain whether the Respondent has satisfied its obligations under the ADAAA or whether its application process violates EEO law. [*See, e.g.*, *id.* at p. 3, 4].

The EEOC also asked for a database of applicants for the CSR position with contact information. [*Id.* at p. 8]. Despite EEOC's meticulous explanation of why the information was sought and relevant, Respondent again refused to answer or provide records responsive to many of the EEOC's key requests, including information about the rest of the online application, a description of information and record storage systems, nationwide information about the pool of applicants, or an employee list. [Ex. 8, pp. 3-4, DISH Responses to 3rd RFI]. Respondent did remark that at least 1,596 applicants who marked "no" to the shift-availability question during the time period in question were not permitted to finish the online application. [*Id.* at p. 2].[4]

In order to determine the lawfulness of DISH's online application process, EEOC must first understand how the application process works – the content and mechanics of the online application process, what electronic records and files relating to the online application process are retained, how these records can be accessed, how these records are used by Respondent, what meaningful avenues were available (if any) for candidates to seek reasonable accommodations for disabilities, and who else may have been affected by the application. This information and these records are central to understanding whether individuals with disabilities were systematically screened out by Respondent's online application process, without Respondent undertaking the individualized assessment and engaging in the interactive process as required under the ADA. Information about who started the application and who failed to complete it, including the identities and contact information of those who were precluded from completing

---

[4] It is unsure what geographic scope of applicant group this figure refers to as Respondent has repeatedly refused to answer questions about nationwide use and data elsewhere. [*See, e.g.,* Ex. 4, p. 8; *see generally* Ex. 6 at pp. 2-3 unilaterally refusing to provide nationwide information].

the online application, are the necessary basis of EEOC's statistical analysis, and the identities of the EEOC's potential class.

Respondent implies, without expressly saying so, that it does not gather or retain any electronic information or records relating to the applicants or exam – dancing around the EEOC's December 20, 2011 RFI by responding that Respondent does not "collect" results of the initial online assessment questions. [Ex. 6 at p. 3; Ex. 8 at p. 3]. But since then, Respondent has not only produced a screen-shot of Stewart's online assessment which contains his name, email address, and two contact phone numbers, [Ex. 5 at p. 20], but Respondent has identified at least 1,596 other applicants who were precluded from finishing the online application specifically because they marked "no" to the shift-work question (but without disclosing their identities or contact information to the EEOC). [*See* Ex. 8 at p. 2]. Moreover, as part of its answers to the EEOC's first RFI, DISH explained that "[a]pplications are entered by the applicant and stored in our online applicant tracking system. As of this date, none have been removed from the system..[and] all steps of the process are tracked for that applicant in regards to that position." [Ex. 4, p. 7].[5] Alongside, Respondent provided a sample applicant log by alphabetical order that contains the names of eight applicants with last names ending in "A" whose applications aborted, including name and email address information. [*Id.* at p. 26].  Hence Respondent has access to, can electronically search, and can easily retrieve information and records relevant to the EEOC's investigation, but has simply chosen not to do so.

---

[5] Moreover, EEOC regulations require employers to retain job applications for a year. 29 C.F.R. § 1602. Furthermore, when a charge of discrimination is filed, the employer is required to preserve all relevant records until "final disposition of the charge or action." *Id.*

Because Respondent did not provide key information necessary for the EEOC to complete its investigation, specifically, information about the complete online assessment and the identity of applicants who were not allowed to complete the online application process, the agency issued Subpoena No. PHX-12-59. [Ex. 9]. Subpoena No. PHX-12-59 was issued on June 28, 2012 and Respondent received it by certified mail on July 2, 2012. [Ex. 10, UPS Confirmation]. On July 12, 2012, after the five days provided for by 29 C.F.R. § 1601.16(b)(1) had lapsed, the EEOC received an untimely "Petition to Revoke Subpoena" dated July 11, 2012, in which Respondent objected on two grounds – relevance and overbroad scope – but no further response to its subpoena. [Ex. 11]. As it had in its RFIs before, [Ex. 7], the EEOC notified Respondent on January 22, 2013 that the EEOC was conducting a nation-wide investigation because of the scope of the online application, but no further information or records were forthcoming. [Ex. 12]. On May 6, 2013, the EEOC issued a second subpoena, No. PHX-13-29. [Ex. 13]. Respondent again failed to provide the information and records requested, and did not file a petition to revoke or modify the subpoena. [Ex. 3, Dir. Decl. at ¶. 5]. Left with no choice, the EEOC is forced to seek the assistance of the Court for enforcement of its subpoenas and requests enforcement of items 4, 5, 6, 7, 8, and 14 for Subpoena No. PHX-12-59, and items 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 with respect to Subpoena No. PHX-13-29.

## II. ARGUMENT

The Respondent failed to exhaust its administrative remedies and has therefore forfeited its right to challenge the subpoenas. Independent of Respondent's waiver of its objections, the Company has no valid defense for failing to comply with the EEOC's two subpoenas.

### A. The Respondent failed to exhaust its administrative remedies and therefore has waived all objections to enforcement of the subpoena.

Pursuant to 29 U.S.C. § 161[6] and 29 C.F.R. § 1601.16(b)(1), a recipient of an EEOC subpoena who does not intend to comply must petition the EEOC to revoke or modify the subpoena within five days of service of the subpoena. "A party's failure to attempt this administrative appeal procedure prevents the party from challenging the subpoena, except on constitutional grounds." *EEOC v. County of Hennepin*, 623 F. Supp. 29, 31-32 (D. Minn. 1985). *Accord EEOC v. Cuzzens of Georgia, Inc.*, 608 F.2d 1062, 1063-64 (5th Cir. 1979); *EEOC v. City of Milwaukee*, 919 F. Supp. 1247, 1255 (E.D. Wis. 1996); *EEOC v. Roadway Express, Inc.*, 569 F. Supp. 1526, 1528-29 (N.D. Ind. 1983); *see also EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 964 (D.C. Cir. 1999) ("section 1601.16(b)(1)'s mandatory language creates a strong presumption that issues parties fail to present to the agency will not be heard in court.").

The Respondent did not petition the EEOC to revoke or modify either of the EEOC's subpoenas within five days, as required by the statute and the related regulations. Respondent waited until July 11, 2012 – one day before its response to the EEOC's Subpoena No. PHX-12-59 was due – before it sought to petition the EEOC. The EEOC issued Subpoena No. PHX-12-59 on June 28, 2012. Respondent received the subpoena on July 2, 2012. [Ex. 10]. Therefore Respondent did not petition the EEOC in the time required by statute. [*See* Ex. 11]. Respondent never petitioned the EEOC at all with respect to Subpoena No. PHX-13-29. [Ex. 3, Dir. Decl. at ¶. 5]. Consequently, all Respondent's objections to enforcement of the subpoenas, other than

---

[6] This section is incorporated into Title VII by 42 U.S.C. § 2000e-9, which, in turn, is incorporated into the ADA by Section 107(a), 42 U.S.C. § 12117(a).

constitutional objections, should not be heard. Because the Respondent does not, and cannot, raise any constitutional objections, the subpoenas must be enforced.

**B. Independent of Respondent's waiver of its objections, it has no valid defense for failing to comply with the EEOC's subpoena.**

Even if Respondent's objections are considered, the Company has no valid defense for failing to comply with the EEOC's two subpoenas. EEOC subpoena-enforcement proceedings are summary in nature and involve only limited judicial review. *EEOC v. Randstad*, 685 F.3d 433, 442 (4th Cir. 2012); *EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d 366, 368 (7th Cir. 2011); *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 649 (7th Cir. 2002); *EEOC v. Kloster Cruise Ltd.*, 939 F.2d 920, 922 (11th Cir. 1991); *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 475 (4th Cir. 1986); *see also EEOC v. Shell Oil Co.*, 466 U.S. 54, 81 (1984) (rejecting argument that notice of the charge was insufficient because allowing respondents to make such an argument would delay EEOC's investigations); *EEOC v. Dillon Cos.*, 310 F.3d 1271, 1277 (10th Cir. 2002) (not allowing "an employer to turn a summary subpoena-enforcement proceeding into a mini-trial by allowing it to interpose defenses that are more properly addressed at trial").[7]

To successfully petition a court to enforce an administrative subpoena, the Commission needs only show that 1) the subpoena is within the agency's authority; 2) the demand is not too indefinite; and 3) the information sought is relevant to the investigation. *Univ. of Pa. v. EEOC*, 493 U.S. 182, 191 (1990); *EEOC v. Shell Oil Co.*, 466 U.S. 54, 72 n.26 (1984); *Randstad*, 685 F.3d at 442; *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 746 (8th Cir. 2011); *Konica*

---

[7] Because the ADA incorporates certain "powers, remedies, and procedures" (42 U.S.C. § 12117(a)) of Title VII of the Civil Rights Act of 1964, this memorandum relies on both ADA and Title VII cases. *See EEOC v. Dillon Cos.*, 310 F.3d 1271, 1274 (10th Cir. 2002) (noting that the ADA uses the enforcement scheme of Title VII, and citing and relying on Title VII cases).

*Minolta*, 639 F.3d at 368; *United Air Lines*, 287 F.3d at 649; *EEOC v. Children's Hosp. Med. Ctr.*, 719 F.2d 1426, 1428 (9th Cir. 1983) (en banc); *EEOC v. A.E. Staley Mfg. Co.*, 711 F.2d 780, 788 (7th Cir. 1983). Once this showing has been made, a court will enforce the subpoena unless the Respondent can prove that the subpoena is unduly burdensome. *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995); *EEOC v. Citicorp Diners Club*, 985 F.2d 1036, 1040 (10th Cir. 1993); *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 475-76 (4th Cir. 1986); *Children's Hosp. Med. Ctr.*, 719 F.2d at 1428; *EEOC v. C & P Tel. Co.*, 813 F. Supp. 874, 875 (D.D.C. 1993). *See also EEOC v. Kronos, Inc.*, 620 F.3d 287, 296 n.4 (3rd Cir. 2010) (listing five prerequisites for enforcement of agency subpoena).

### 1.  *The subpoena is valid and within the agency's authority.*

First, Congress has authorized, and indeed mandated, that the EEOC investigate charges of discrimination alleging that the ADA has been violated. 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(b)). Congress has conferred on the Commission broad powers of access to records of those entities against whom charges have been filed, 42 U.S.C. § 2000e-8(a) (incorporated by 42 U.S.C. § 12117(a)), including the authority to subpoena evidence in an investigation, 29 U.S.C. § 161 (incorporated by 42 U.S.C. § 2000e-9, which, in turn, is incorporated into the ADA by 42 U.S.C. § 12117(a)). The EEOC is investigating Stewart's allegations that the Respondent engaged in disability discrimination and utilizes a discriminatory online application process in violation of the ADA. Such an investigation is within the agency's statutory authority. Thus, the first prong of the test has been satisfied.[8]

---

[8] At this time, Stewart's age discrimination allegations are not the focus of the EEOC's subpoena enforcement action although the EEOC continues to investigate these allegations internally. Information and records obtained from the enforcement of the EEOC's two subpoenas may provide

## 2. *All procedural prerequisites have been fulfilled.*

Second, a valid charge has been filed and the subpoenas contain all the information required by the EEOC's regulations. "Any District Director, and the Director of the Office of Field Programs, or upon delegation, the Director of Field Management Programs, or any other representative designated by the Commission, may sign and issue a subpoena on behalf of the Commission. The subpoena shall state the name and address of its issuer, identify the person or evidence subpoenaed, the person to whom and the place, date, and the time at which it is returnable or the nature of the evidence to be examined or copied, and the date and time when access is requested. A subpoena shall be returnable to a duly authorized investigator or other representative of the Commission." 29 C.F.R. § 1601.16(a). Respondent does not dispute that Stewart's charge is valid. *See generally EEOC v. Shell Oil Co.*, 466 U.S. 54, 67-74 (1984) (addressing requirements of valid charge); 29 C.F.R. § 1601.12 (same). EEOC Subpoena Nos. PHX-12-59 and PHX-13-29 include all of the necessary information under the regulations. They Subpoena No. PHX-12-59 was issued by Rayford O. Irvin, the District Director for the EEOC Phoenix District Office and Subpoena No. PHX-13-29 was signed by Elizabeth Cadle, Deputy Director, with delegated powers on behalf of Irvin. Both subpoenas describe the evidence subpoenaed; specify the address, date and time due, and the respective investigators (Lorna Simpson and Orlando Garcia) to whom the records are to be delivered to; and have the required dates, June 28, 2012 and May 3, 2013 respectively. [Ex. 9, 13]. Accordingly, all the procedural prerequisites are met, and Respondent does not, and could not, allege that these basic requirements have not been met.

---

additional evidence relevant to Stewart's age allegations as well.

3.  *The information sought is definite and relevant.*

The EEOC has repeatedly sought specific, definite information and records about DISH's online application process. Respondent does not complain that the EEOC's requests are too indefinite. Rather, DISH contends only that the information and records sought are irrelevant and overbroad. [Ex. 11]. The concept of relevancy during an EEOC investigation is broader than that which underlies subsequent litigation. *See EEOC v. Dillon Cos.*, 310 F.3d 1271, 1274-75 (10th Cir. 2002)("...we have explained ...[that] such subpoenas 'may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose.'"); *EEOC v. Bashas', Inc.*, 828 F. Supp. 2d 1056, 1067 (D. Ariz. 2011) ("[r]elevancy in this context is determined in terms of the investigation rather than in terms of evidentiary relevance."). The statute broadly grants the EEOC access to "any evidence of any person being investigated or proceeded against that relates to unlawful employment practices covered by this subchapter and is relevant to the charge under investigation." 42 U.S.C. § 2000e-8(a) (incorporated by 42 U.S.C. § 12117(a)). "[C]ourts have generously construed the term 'relevant' and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer." *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984). *Accord EEOC v. Randstad*, 685 F.3d 433, 448 (4th Cir. 2012); *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 747 (8th Cir. 2011); *EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d 366, 369 (7th Cir. 2011); *EEOC v. Kronos, Inc.*, *supra*, 620 F.3d at 296; *EEOC v. Dillon Cos.*, 310 F.3d 1271, 1274 (10th Cir. 2002); *EEOC v. United Air Lines, Inc.*, 287 F.3d 643, 652 (7th Cir. 2002); *EEOC v. Roadway Express, Inc.*, 261 F.3d 634, 639-40 (6th Cir. 2001); *EEOC v. Univ. of Pittsburgh*, 643 F.2d 983, 986 (3rd Cir. 1981). The Commission does not need to present a "specific reason

15

for disclosure" of the requested information, *Univ. of Pa. v. EEOC*, 493 U.S. 182, 194 (1990), and courts generally will defer to the agency's appraisal of what is relevant "so long as it is not obviously wrong," *EEOC v. Randstad*, 685 F.3d at 448 (internal citations omitted).

The holding in *EEOC v. Kronos, Inc.,* 620 F.3d 287 (3rd Cir. 2010), is particularly instructive here because the fact pattern is remarkably identical. In both cases, the EEOC seeks to investigate the use of a nation-wide, standardized, application process developed by a third-party and used by the employer and which a single Charging Party, at a single location, alleges the use of which resulted if discriminatory failure-to-hire under the ADA. *Id.* at 292-93. In *Kronos*, the Third Circuit reversed the district court and enforced the EEOC's administrative subpoena for nation-wide discovery of information and records on the grounds that, "...the EEOC has the power to investigate a broader picture of discrimination which unfolds in the course of a reasonable investigation of a specific charge…[and] An employer's nationwide use of a practice under investigation supports a subpoena for nationwide data on that practice." *Id.* at 297, 299, 300. The *Kronos* Charging Party was hearing and speech impaired. *Id.* at 292. She applied for a position with Kroger (the employer), and alleged in her EEOC charge that she was denied employment due to the discriminatory use of the "Kronos Assessment" – a customer service assessment developed by Kronos for Kroger. *Id.* After Kroger admitted it relied on the standardized assessment at least in part in all of its hiring decisions across the country, the EEOC issued a nation-wide RFI to Kroger, and subpoenaed Kronos, seeking information and records relating to the nationwide use of the assessment for not only in the Charging Party's position but other positions than that which she applied for, copies of validation tests, and documents relating to whether the Kronos Assessment adverse impacted other applicants with disabilities. *Id.* at 293.

16

In reversing the lower court, the Third Circuit emphasized that enforcement of the subpoena on a nation-wide scope was proper because the information sought by the EEOC was relevant to the agency's investigation including whether Charging Party was discriminated against and adversely impacted by use of the assessment both as an individual and/or as a member of a class of individuals; that information about the test and how it was developed was relevant to EEOC's investigation into use of the application and also as "useful context" for evaluating Kroger's hiring practices; and that the information and records sought might supply the EEOC with comparator data relevant to the investigation. *Id.* at 297-99.

Here, the EEOC's subpoenas should be enforced because EEOC is investigating if DISH discriminated against Stewart and other disabled applicants for employment by relying on a potentially discriminatory online application process which improperly denies employment opportunities to individuals with disabilities, has a negative disparate impact on applicants with disabilities, and provides no known avenue for an applicant to request an accommodation thus triggering the interactive process, and providing individuated abilities assessment. DISH's responses to the EEOC's investigation thus far indicate that the application is used nation-wide, for a broad "family" of positions, and that at no time during the electronic application is a candidate with disabilities able to explain or to request an accommodation, triggering the interactive process. This holds true not only for the preliminary shift-availability question answered by Stewart, but according to Respondent, for the rest of the online application as well – the content of which EEOC knows nothing about after several years of trying to get answers. Respondent has confirmed that no applicant has been hired who has not completed the entire

online application process. Thus, nationwide information and records with respect to the entire online application is relevant, not overbroad, and appropriate in this case.

The *Kronos* Court is not the only Circuit to recognize the expansive meaning of relevance in the context of the EEOC's administrative investigation. In reviewing subpoena enforcement actions, numerous courts have recognized the relevance of information about matters not specifically mentioned in the charge, such as information on other job classifications, other departments, and related bases of discrimination. *E.g., EEOC v. Randstad*, 685 F.3d 433, 450-51 (4th Cir. 2012) (deferring to the Commission's opinion that data on the types of jobs into which workers were placed, even placements from offices other than the one where the charging party worked, might help the EEOC assess the respondent's requirement that employees be able to read and write English); *EEOC v. Schwan's Home Serv.*, 644 F.3d 742, 748 (8th Cir. 2011) ("Because the EEOC's investigation into Milliren's charge of individual gender discrimination revealed potential systemic gender discrimination, the EEOC had the authority to subpoena information relevant to systemic gender discrimination even absent a valid systemic charge by Milliren"); *EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d 366, 369-71 (7th Cir. 2011) (ruling that EEOC is entitled to hiring data even though charge addressed terms and conditions of employment, disparate discipline, and retaliation, but not discriminatory hiring; "When the EEOC investigates a charge of race discrimination for purposes of Title VII, it is authorized to consider whether the overall conditions in a workplace support the complaining employee's allegations."); *EEOC v. Roadway Express, Inc.*, 261 F.3d 634, 638 (6th Cir. 2001) (enforcing subpoena that sought evidence in different job classifications and hiring situations because the evidence could provide context to determine if discrimination occurred); *EEOC v.*

*Recruit U.S.A., Inc.*, 939 F.2d 746, 756 (9th Cir. 1991) (in context of injunction to compel the company to preserve records, observing that the EEOC may investigate "the full picture" of the company's recruitment and hiring practices, including individuals and classifications not specifically named in the charge); *EEOC v. Tempel Steel Co.*, 814 F.2d 482, 485 n.9 (7th Cir. 1987) (stating that EEOC may request information concerning sex and national origin of applicants and new hires in case where charge alleged race discrimination in failure to recall); *EEOC v. Univ. of Pittsburgh*, 643 F.2d 983, 985-86 (3rd Cir. 1981) (finding lists and information concerning instructors and teaching positions in four professional schools relevant to charge of sex discrimination in compensation in school of nursing); *EEOC v. Cambridge Tile Mfg. Co.*, 590 F.2d 205, 206 (6th Cir. 1979) (holding that information about sex discrimination in job classifications relevant to charges of sex and race discrimination in firing); *Joslin Dry Goods Co. v. EEOC*, 483 F.2d 178, 184 (10th Cir. 1973) (concluding that the EEOC could investigate hiring as well as firing practices even though the charge alleged discriminatory firing, but not discrimination in hiring); *Ga. Power Co. v. EEOC*, 412 F.2d 462, 468 (5th Cir. 1969) (finding relevant to the investigation records pertaining to individuals and positions other than the individuals and employment positions specifically named in the charge). If an investigation discloses a violation that was not alleged in the charge, the EEOC is not required to obtain a new charge from the aggrieved individual or to issue a Commissioner's charge. *EEOC v. Astra USA, Inc.*, 94 F.3d 738, 746 (1st Cir. 1996) (stating that a charge of discrimination enables the Commission to initiate a wide investigation, "including a full probing of any evidence of discriminatory practices unearthed during the course of the initial investigation"); *EEOC v. Lakeside Bldg. Maint., Inc.*, 255 F. Supp. 2d 871 (N.D. Ill. 2003) (holding that EEOC may

19

investigate hiring and assignment based on national origin at all respondent's locations even though the charging party worked at one location and desired to withdraw her charge).

Here, the information requested in EEOC's Subpoena Nos. Subpoena No. PHX-12-59 and PHX-13-26 are directly relevant to EEOC's investigation of Stewart's charge of discrimination. Stewart alleges that he was denied the opportunity of employment because, even though he was qualified, Respondent's online application would not let him finish. [*See* Ex. 1]. DISH concedes that this online application is a nationwide prerequisite before the company is willing to consider a candidate for the CSR position and other jobs in the same "family." [Ex. 6 at pp. 2-3]. The subpoenas themselves are lengthy and therefore the verbatim requests are included as Exhibits 9 and 13 hereto. However, to condense and summarize, the information and records the EEOC in essence seeks with respect to Subpoena No. PHX-12-59 includes:

4. Screen-shots of each stage of the online application, including abort screens and screens which provide an applicant with any instructions;

5. A description of the role the online application plays with respect to CSR hiring procedures, specifically, numbers of applicants who completed and did not complete the application and other necessary information on a nation-wide basis.

6. A description of how Respondent collects data and results and reviews this data in order to make hiring decision.

7. An explanation of how applicants are selected to advance to the next stage after the online process.

8. A description of how Respondent stores, collects, and preserves the results of the online application.

14. An electronic database which contains the email address and full names, address, and telephone numbers of individuals who have applied for the CSR position from March 9, 2009 to the present.

And with respect to Subpoena No. PHX-13-29, the EEOC in essence requests enforcement of the following:

1.       A detailed description of the complete online application process, including descriptions of each stage, not just the pre-screening stage; and a list of all positions for which completing this online application is required.

2.       The list of questions found at each stage of the online application process (not just the pre-screening stage); and screen-by-screen-shots for each stage and for any screens that instruct an applicant to an alternative method of application;

4.       Validation results and records, if such exist.

5.       Copies of any impact studies done with respect to each stage of the online application.

6.       Job descriptions for each position, including but not limited to, CSR, for which the online application is used.

7.       Description of job analysis done for each position for which the online application is in use.

8.       A list of all positions, not just CSR, for which DISH requires applicants to complete the "pre-screening questions" found in the CSR online application.

9.       The number of applicants affected by the online application nationwide for the CSR position.

10.       Details about the electronic records and record-storage system used by DISH relating to applicants who began the online application in question, whether they completed the online application or not.

11.       Similar details about the electronic records and record-storage system maintained by FurstPerson and other potential contractors.

The EEOC's requests with respect to application questions, screen shots, abort screens, and instructions screens (PHX-12-59 No. 4 and PHX-13-29 Nos. 1, 2) are relevant because EEOC cannot assess whether Respondent's online application discriminates against disabled applicants if the EEOC does not even know what the content of the application is. Likewise, requests for

information and records about how the online application process fits into the larger selection process (PHX-12-59 Nos. 6, 7) are relevant because the EEOC must be able to understand how hiring decisions are made if it is to be able to assess whether the ADAAA is violated by Respondent's hiring practices. The same is true for records with respect to validation and impact studies, (PHX-13-29 Nos. 4,5), which are central to disparate impact analysis and whether an employer took proper precautions in developing prerequisites and uniform mandatory criteria. Requests for nation-wide data on applicants for the CSR position at all stages of the online application and hiring process (PHX-12-59 No. 5 and PHX-13-29 No. 9) are relevant the EEOC's statistical analysis under a disparate impact analysis. Items which seek description about how and what data is collected and stored (PHX-12-59 Nos. 6, 8 and PHX-13-29 Nos. 10, 11 (requests duplicated in PHX-12-59)) are relevant to the EEOC's understanding of what records exist and how they are maintained so that the EEOC may request them in its investigation. Requests asking Respondent to identify other positions that were required to complete the same online application (PHX-13-29 Nos. 1, 6, 7, 8) are relevant to whether other applicants for positions outside of the CSR position were affected by the exam, and to see if Respondent narrowly tailored the shift-availability and other questions to the actual essential job duties of the CSR position, or if the shift-availability and other preliminary questions are simply pro-forma prophylactic questions with little or no relationship to the essential job functions of any particular job including the CSR position. And finally, a nation-wide request for the identity and contact information for applicants to the CSR position (PHX-12-59 No. 14) is relevant because the online application was used nationwide and no one who did not complete it was considered for employment according to Respondent. This practice has the potential of affecting thousands of

applicants, and the EEOC needs the information for purposes of indentifying and interviewing witnesses, identifying other disabled applicants who may have been affected, and identifying comparators. As in with the *Kronos* subpoena, the requested information EEOC seeks here is relevant to Respondent's hiring practices and use of a nation-wide, standardized, application process which potentially subjected Stewart and many other applicants with disabilities to unlawful discrimination. The issues on which EEOC seeks documents reasonably arose during the course of the EEOC's investigation of the charge against the Respondent, and the information sought is relevant. Thus the subpoena should be enforced.

### 12. Compliance With the Subpoena Does Not Impose an Undue Burden on the Respondent.

It follows that the Court should enforce the subpoenas unless the Respondent shows that the cost of compliance with the subpoenas is "unduly burdensome in the light of the company's normal operating costs." *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 479 (4th Cir. 1986). Thus, the Court should enforce the subpoena unless the Respondent shows that the cost of compliance with the subpoena is "unduly burdensome in the light of the company's normal operating costs." *EEOC v. Md. Cup Corp.*, 785 F.2d 471, 479 (4th Cir. 1986). Respondent does not allege undue burden. In its untimely petition to Subpoena No. PHX-12-59 Respondent's only bases are that the EEOC's subpoena for information is overbroad in scope and does not seek relevant evidence. [Ex. 11 at pp. 4-8]. The Respondent does not, and could not, claim that compliance with the subpoena would impose an undue burden on the company. Respondent has already indicated that the information sought by the EEOC with respect to applicant data and records has been preserved and is electronically stored. Respondent has provided EEOC with a sample list of eight applicants who did not complete the online application, including contact information, indicating

that the information is searchable and easily retrievable and producible. Respondent was also able to isolate and produce a copy of Stewart's online application. Thus, the EEOC's subpoenas should be enforced.

### III. CONCLUSION

For the foregoing reasons, the Court should enforce the EEOC's subpoenas. The subpoenas seek information relevant to a valid charge of discrimination that is within the EEOC's enforcement authority. Further, the Respondent has not established that complying with the subpoenas would be unduly burdensome. The information and records the EEOC seeks are relevant and are not overbroad as the issue in this investigation is a nationwide online assessment that all applicants for a "family" of positions, including the Customer Service Representative position, must complete if they are to be considered for possible employment. The Commission therefore urges the Court to issue the accompanying proposed Order to Show Cause, and, after giving the Respondent an opportunity to be heard, enforce subpoena items 4, 5, 6, 7, 8, and 14 in Subpoena No. PHX-12-59, and subpoena items 1, 2, 4, 5, 6, 7, 8, 9, 10, and 11 in Subpoena No. PHX-13-29.

Respectfully submitted this 4th day of December, 2013,

*/s/ Iris Halpern*
IRIS HALPERN
Trial Attorney
(303) 866-1374
iris.halpern@eeoc.gov

EQUAL EMPLOYMENT
   OPPORTUNITY COMMISSION
Denver Field Office
303 East 17th Avenue, Suite 410
Denver, Colorado 80203
Facsimile: (303) 866-1375